## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

WALTER PESCHEL, M.D.,                         CV 08-79-M-JCL

                  Plaintiff,

                                 ORDER

      vs.

CITY OF MISSOULA, acting through the
Missoula Police Department,
MISSOULA CITY POLICE CHIEF RUSTY
WICKMAN, ASSISTANT CHIEF MARK MUIR,
LT. GREGG WILLOUGHBY, SGT. DANIEL JASON
HUNTSINGER, OFFICER CRAIG SERBA,
and OFFICER RYAN PRATHER,

                  Defendants.

_____

      This matter is before the Court upon Defendants Rusty Wickman, Mark

Muir, and Gregg Willoughby's Fed. R. Civ. P. 56 motion seeking summary

judgment upon the claims advanced against them under 42 U.S.C. § 1983.  For the

reasons discussed below, the Court deems it appropriate to grant the motion.

## I.    INTRODUCTION

      This action has its genesis in the August 18, 2007 arrest of Plaintiff Walter

Peschel by officers of the City of Missoula, Montana Police Department.  Peschel

was charged with, and prosecuted for, the misdemeanor offense of obstructing a

ORDER - Page 1

peace officer in violation of Mont. Code Ann. § 45-7-302.  Peschel was ultimately acquitted of the charge by a jury.

Peschel, and his wife Peggy, commenced this action against the individual officers who participated in Peschel's arrest, their superiors, and the City of Missoula.  The Peschels advance claims for relief under the Federal Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, as well as Montana's Constitution and common law.  All of the Peschels' claims for relief are bottomed on three basic assertions:  (1) the officers lacked probable cause to arrest Peschel - thus rendering his arrest unlawful; (2) the officers used excessive force to effect the arrest; and (3) the officers deprived Peschel of necessary medical treatment after the arrest.  To put the Peschels' claims in perspective, review of the circumstances surrounding the arrest is in order.

On August 18, 2007, Walter Peschel was mowing the lawn at an apartment complex he owns in Missoula when tenant, Anna Martello, asked him for assistance with another tenant, Julie Huguet.  Peschel, a medical doctor, found Huguet in her car nearly unconscious from an apparent prescription medication overdose.  Huguet had a gun and was threatening to commit suicide.  Peschel engaged Huguet to dissuade her from taking her life - while directing Martello to call 911.

ORDER - Page 2

Numerous City of Missoula police officers responded to the scene.  The officers immediately ordered Peschel to get away from Huguet's car and out of the line of fire.  Instead of complying with the officers' directive, Peschel asked the officers to assist him with Huguet.  With their guns trained in the direction of Peschel and Huguet, the officers repeated their command that Peschel move away from Huguet's car.  Again, Peschel would not move away from Huguet's car because Huguet had apparently told him she would shoot herself if he left.

The tension between Peschel and the officers escalated as Peschel, agitated by the manner in which the police responded to the situation, cursed at the officers.  The standoff continued for approximately 46 minutes - the officers repeatedly ordering Peschel to move away from the car and Peschel refusing.

Eventually, Huguet lost consciousness and sloughed to the seat of the car. At that point, Peschel moved away from the car to the top of a nearby grassy knoll. From below, Officer Duncan Crawford ordered Peschel to come down the knoll. When Peschel did not immediately comply with Crawford's order, the commanding officer at the scene, Jason Huntsinger, issued the order to arrest Peschel.  Officer Craig Serba responded by knocking Peschel down from behind causing him to fall down the grassy slope.  Peschel states that during his arrest Officers Serba and Ryan Prather were on top of him, and that he felt someone knee

ORDER - Page 3

him in the back.  Peschel also asserts that either Serba or Crawford used a taser on him - the officers claim no taser was used.

Peschel claims he suffered various injuries during the course of the arrest. He complains that although emergency medical responders were at the scene, the officers failed to offer him necessary medical treatment - notwithstanding the fact that Officer Prather noticed that Peschel was panting and sweating after the arrest. Instead, according to Peschel, the officers placed him face down in a police car - leaving him there with windows rolled up and no air conditioning on a very hot day.

The events which occurred at the scene - including the conduct of Officers Serba and Prather in gaining physical custody of Peschel - were recorded by a video camera located in one of the police cars.  The video was eventually uploaded to the hard drive of a Missoula Police Department computer and viewed by several police officers in the days following the arrest.  At some point, however, the video was "lost", as were numerous other video recordings of unrelated police encounters.  The City of Missoula unsuccessfully attempted to retrieve the video through a forensic computer analysis.

Defendants Wickman, Muir and Willoughby ("Supervisory Officers") were, at the time of Peschel's arrest, the Chief of Police, Assistant Chief of Police and a

Lieutenant, respectively.  Muir and Willoughby were not on the scene.  Wickman had been communicating with Huntsinger - the commanding officer on the scene - by cell phone as the events transpired.  Wickman arrived at the scene after Peschel was in custody.

Peschels seek to impose supervisory liability - in other words personal liability - under § 1983 upon the Supervisory Officers for allegedly:  (1) failing to properly train and supervise their subordinate on-the-scene officers; and (2) ratifying the subordinate officers' conduct.  Additionally, the Peschels seek to impose supervisory liability upon Muir for allegedly failing to adequately investigate the conduct of the subordinate officers.

In a separate vein, the Peschels seek to impose personal liability upon the Supervisory Officers under § 1983 for allegedly "conspiring to conceal or cover-up officer misconduct".  As best as can be ascertained from the Peschels' ill-defined argument, it appears they contend the Supervisory Officers failed to preserve, or undertake to timely retrieve the video in order to inhibit Peschel's criminal defense and the prosecution of this civil action.

The Supervisory Officers claim summary judgment is appropriate because they are entitled to qualified immunity with respect to all claims advanced against

ORDER - Page 5

them by the Peschels under authority of 42 U.S.C. § 1983.[1]  For the reasons

discussed below, the Court agrees.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) entitles a party to summary judgment

"if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  A party moving for summary judgment

who does not have the burden of persuasion at trial, must produce evidence which

either:  (1) negates an essential element of the non-moving party's claim, or (2)

shows that the non-moving party does not have enough evidence of an essential

element to ultimately carry his burden at trial.  *Nissan Fire & Marine Ins. Co. Ltd.*

*v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has satisfied its burden, the non-moving party must

go beyond the pleadings and designate by affidavits, depositions, answers to

interrogatories, or admissions on file, "specific facts showing that there is a

genuine issue for trial."  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  A

---

[1]By Order entered January 5, 2009, the Court dismissed the claims advanced
by the Peschels against the Supervising Officers under state law, as well as the
federal claims advanced against the officers in their official capacities.

party opposing summary judgment must identify evidence establishing that a dispute as to a particular material fact is genuine. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*.  The party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case. *Id*. at 248.

"In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds as noted in Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

ORDER - Page 7

### B.    Supervisory Liability Under 42 U.S.C. § 1983 - Generally

Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1948 (2009) (italics in original).[2] Rather, a plaintiff must establish that each individual "Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* In other words, supervisory officials "cannot be held liable unless they themselves" violated a constitutional right. *Id.* 129 S. Ct. at 1952.

Supervisory liability under § 1983 - the personal liability of a supervising official for the unconstitutional conduct of the official's subordinates - may be imposed in certain circumstances. "A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991). However, a supervisor may have sufficient involvement in the subordinate's conduct to impose liability on the supervisor under 42 U.S.C. § 1983. *Id.* "[A] supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations of

---

[2]Vicarious liability can be imposed on a supervisory official only if state law imposes such liability. *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citation omitted). Peschel does not contend Montana law imposes vicarious liability on the Supervising Officers.

ORDER - Page 8

subordinates and failed to act to prevent them.'" *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (citation omitted).

The Ninth Circuit has recently identified the four general situations in which supervisory liability may be imposed:  (1) "for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict constitutional injury;" (2) for the supervisor's "own culpable action or inaction in the training, supervision, or control of [] subordinates,"; (3) "for [the supervisor's] acquiescence in the constitutional deprivations of which the complaint is made,"; or (4) "for conduct that showed a reckless or callous indifference to the rights of others." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (citation omitted) and *Al-Kidd v. Ashcroft*, __ F.3d __, 2009 WL 2836448, *13 (9th Cir. 2009) (citation omitted).  Because supervisory liability is "direct liability" there must exist "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001) (internal quotations and citations omitted).  *See also Redman v. County of San Diego*, 942 F.3d 1435, 1447 (9th Cir. 1991) (emphasizing the supervisor's breach of duty must be a proximate cause of the injury).  "The critical question is whether it was reasonably foreseeable [to the supervisor] that the actions" of his or

her subordinates would lead to the violations of the plaintiff's constitutional rights which are alleged to have occurred. *Kwai Fun Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004).

Because supervisory liability is personal liability, an official against whom a claim of supervisory liability is advanced may assert the affirmative defense of qualified immunity. *Al-Kidd v. Ashcroft*, __ F.3d __, 2009 WL 2836448, *12-13 (9th Cir. 2009) (citation omitted). The doctrine of qualified immunity provides a public official performing a discretionary function immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity is "immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The analysis employed in determining whether a government official is entitled to qualified immunity consists of two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under this inquiry, if there is no constitutional violation no further inquiry is necessary. *Id*.

ORDER - Page 10

Second, if a violation of a constitutional right can be found, was the right clearly established? *Id*. Under this inquiry, a defendant may be shielded from liability if his or her "actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow*, 457 U.S. at 818).

When considering qualified immunity, the court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 818 (2009).

Where a plaintiff asserts liability against a supervisory defendant for his or her conduct in connection with a subordinate, for purposes of the qualified immunity analysis, the plaintiff must establish that each individual defendant participated in the violation of a constitutional right. The plaintiff must establish that the subordinate committed a violation of a constitutional right, and that the violation is attributable to the personal conduct of the supervisory defendant. *Poe v. Leonard*, 282 F.3d 123, 133-35 (2nd Cir. 2002). *See also Al-Kidd v. Ashcroft*, __ F.3d __, 2009 WL 2836448, *12-13 (9th Cir. 2009) (citation omitted). Conduct that violates a constitutional right must be attributable to each individual defendant. *McDade v. West*, 223 F.3d 1135, 1142 (9th Cir. 2000).

ORDER - Page 11

### C.   Walter Peschel's Claims Under 42 U.S.C. § 1983

To establish that a defendant is liable for a claim under 42 U.S.C. § 1983 a "plaintiff must show '(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right.'"  *Harry A. v. Duncan*, 351 F. Supp. 2d 1060, 1072 (D. Mont. 2005) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  Section 1983 liability requires proof that a defendant's deliberate or affirmative act or omission caused the unconstitutional deprivation. *Harry A.*, at 1072 (citing *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989)).  *See Daniels v. Williams*, 474 U.S. 327, 330-332 (1986) (concluding mere negligent conduct is insufficient for a claim under § 1983).

Peschel claims the on-the-scene officers violated his constitutional rights by (1) using excessive force to effect his arrest; and (2) depriving him of necessary medical treatment after the arrest.

The Fourth Amendment to the United States Constitution protects individuals against the use of excessive force by law enforcement in effecting an arrest.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  "Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under

the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (quoting *Graham*, 490 U.S. at 397).

The Due Process Clause of the Fourteenth Amendment, in turn, protects a pretrial detainee's rights to medical care and treatment for injuries. *Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009). If "officials fail to respond appropriately [to a serious medical need of a pretrial detainee] and instead act in a manner that will foreseeably result in harm, they violate [his] due process rights." *Id*. at 1051.

The issue of whether excessive force was used by the officers in arresting Peschel has been determined through the Court's resolution of Peschel's motion for sanctions for spoliation of the video recording of the events which occurred at the scene of the arrest. The Court has concluded that the appropriate sanction for the unexplained spoliation of the recording is to deem, as established, the fact unreasonable force was used to effect the arrest of Walter Peschel. Dkt. #313 at 15. It will remain for the jury to determine the injuries, if any - together with consequent damages - that were sustained by Peschel.[3]

The issue of whether the on-the-scene officers deprived Peschel of necessary medical treatment in violation of the due process clause remains to be

---

[3]The Court has also reserved for determination by the jury whether Peschel was tasered during the arrest. Dkt. #313 at 15.

ORDER - Page 13

determined at trial.  For purposes of resolving the present motion, the Court will

assume that Peschel could establish that the individual officers also violated his

due process right to medical treatment.

For purposes of the present discussion, it is established that the subordinate

officers' conduct violated Peschel's Fourth and Fourteenth Amendment rights.

The Court turns then to address whether the Supervising Officers' actions or

inactions provide a basis for imposing supervisory liability in accordance with the

standards previously discussed.

### 1.    **Rusty Wickman**

As noted, Wickman was the Chief of Police on August 18, 2007 - the date

of Peschel's arrest.  Wickman retired in May 2008.

Although Wickman was not immediately at the scene, Sgt. Huntsinger

contacted Wickman by cell phone and consulted with him about Peschel's

conduct.  Huntsinger relayed the events and circumstances to Wickman over the

cell phone, and advised Wickman that Peschel was obstructing the police officers.

During the phone conversation, Wickman told Huntsinger that if Peschel was

obstructing a police officer then the officers should arrest Peschel.  Deposition of

Rusty Wickman (March 12, 2009) at 134.  By the time Wickman arrived at the

scene, the police officers had arrested Peschel and were placing Peschel in a patrol vehicle.

Peschel does not suggest Wickman directly participated in either the arrest of Peschel or the alleged denial of medical treatment to Peschel.  Nor does Peschel contend that Wickman directed the city officers to violate Peschel's rights. Instead, Peschel advances numerous theories to argue Wickman is liable in his capacity as Chief of Police, in failing to properly supervise his subordinate officers.

For the reasons discussed below, the Court concludes Peschel has failed to establish that Wickman, as a supervisory officer, is liable in his individual capacity.  Peschel has failed to raise a genuine issue of material fact demonstrating that any conduct on the part of Wickman caused a violation of Peschel's constitutional rights.  Therefore, Wickman is entitled to qualified immunity and dismissal from this action.

### a.    Promotion of Huntsinger to Sergeant

First, Peschel argues Wickman is liable for any violations of his rights committed by the on-the-scene officers because Wickman recommended Huntsinger's promotion to Sergeant in 2006.  According to Peschel, Huntsinger was unfit to hold that position.

ORDER - Page 15

Before Sgt. Huntsinger was employed by the Missoula Police Department, he had resigned as a police officer in Downey, California.  An internal investigation in Downey found that Huntsinger had taken inappropriate photographs of female victims, impermissibly kept the photographs in his locker, and made false statements during the investigation.  Peschel asserts Huntsinger's past conduct rendered him incompetent to be a Sergeant, and thus unfit to serve as commanding officer at the scene of Peschel's arrest.

Even if it is assumed that Wickman was fully aware of Huntsinger's history in Downey, California, Peschel has failed to establish any causal connection between Huntsinger's prior conduct, Wickman's promotion of Huntsinger, and any violation of Peschel's constitutional rights by the officers on the scene at Peggio Lane.[4]  The improper conduct of Huntsinger as an officer in Downey, California was not of such a nature that it would have put Wickman on notice that Huntsinger might allow police officers under his command to use excessive force in effecting an arrest or to deprive an arrestee of medical treatment.  *See Kwai Fun*

---

[4]It is undisputed that Huntsinger did not have any physical contact with Peschel at any time.  As the commanding officer, Huntsinger merely ordered Peschel to step away from Huguet's car, and he later ordered the other officers to arrest Peschel.  Huntsinger did not direct the other officers as to how to effect Peschel's arrest, the amount of force they should use, or whether they should provide medical treatment to Peschel.  Defendants' Statement of Undisputed Facts at ¶¶ 23-37 (Dkt. # 175).

ORDER - Page 16

*Wong*, 373 F.3d at 966 (requiring that it must be reasonably foreseeable to the supervisor that the actions of his or her subordinates would lead to the violations of the plaintiff's constitutional rights which are alleged to have occurred) . Peschel has failed to raise a genuine issue of material fact suggesting that Wickman's promotion of Huntsinger in 2006 set in motion acts by Huntsinger that Wickman knew, or reasonably should have known would cause others to violate Peschel's constitutional rights in the manners alleged.  Accordingly, Peschel has failed to establish that Wickman is liable by virtue of his role in promoting and supervising Huntsinger.

### b.   Training in Crisis Intervention

Peschel next argues that Wickman should be held liable because he:  (1) failed to provide sufficient "Crisis Intervention Training" ("CIT") for the Department police officers; and (2) failed to have procedures in place to ensure that a CIT-trained officer was present on the scene at Peggio Lane.  No CIT-trained officer was dispatched to the scene.

Crisis Intervention Training is a nationwide program directed at training individuals how to deal with mentally ill persons in crisis situations.  As of August 18, 2007, only two Missoula police officers had received CIT training.

ORDER - Page 17

Peschel contends the absence of sufficient CIT training resulted in the

Department inappropriately responding to Huguet's attempted suicide.  Peschel

contends the police officers should have approached and addressed Huguet

calmly, and should have worked with Peschel to resolve the crisis.

An individual supervisory defendant can be liable for his or her failure to

train subordinates when:

> in light of the duties assigned to specific officers or employees, the need for
> more or different training is obvious, and the inadequacy so likely to result
> in violations of constitutional rights, that the [supervisor]... can reasonably
> be said to have been deliberately indifferent to the need.

*Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (quoting *City of Canton v.*

*Harris*, 489 U.S. 378, 390 (1989)).  The facts must demonstrate that the failure to

train was the result of  " 'a "deliberate" or "conscious" choice' to 'follow a course

of action ... from among various alternatives[.]'"  *Clement*, 298 F.3d at 905

(quoting *City of Canton*, 489 U.S. at 389).  *See White v. Golden State Eye Center*,

2009 WL 817937, *6 (E.D. Cal. 2009) (identifying elements of a claim for failure

to train).

A claimant must also establish a sufficient causal connection between the

supervisor's wrongful conduct and the constitutional violation alleged to have

occurred.  *Redman v. County of San Diego*, 942 F.3d 1435, 1446-47 (9th Cir.

1991).  To impose liability on the supervisor, his or her failure to train must result

ORDER - Page 18

in the violation of the plaintiff's constitutional rights.  *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680 (9th Cir. 1984).  *See also Roe v. Nevada*, 621 F. Supp. 2d 1039, 1056 (D. Nev. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)); *Harris v. Maloughney*, 827 F. Supp. 1488, 1492 (D. Mont. 1993) (citing *Ybarra*).

Peschel has not identified any facts demonstrating that Wickman's CIT training decisions caused the police officers' excessive use of force on Peschel, or the officers' alleged deprivation of Peschel's right to medical treatment.  Peschel's arguments suggest only that proper CIT training would have trained the police officers in the proper methods of resolving a crisis involving a mentally ill person, and would have permitted the officers to work together with Peschel to assist Huguet.  Peschel does not identify any facts on which a jury could conclude that the failure to provide CIT training was so likely to result in, or did result in (1) the excessive use of force on Peschel, or (2) the officers' failure to provide medical care for Peschel.  Peschel acknowledges CIT training does not address these two identified subjects.  Peschel has failed to demonstrate a causal connection between Wickman's CIT training decisions and Peschel's claims.

### c.   Ratification

Peschel contends that Wickman is liable under § 1983 for ratifying the on-the-scene officers' conduct during the events that transpired at Peggio Lane.  The sole support offered by Peschel for this theory is Wickman's deposition testimony. When asked whether, in retrospect, it was his opinion that "the officers at the scene of Peggio Lane handled the incident the way the Missoula Police Department would have wanted them to handle the situation[,]" Wickman stated: "To the best of my knowledge, yes."  Deposition of Rusty Wickman (March 12, 2009) at 188 (Dkt. 247-4 Ex. 12).

In limited circumstances a supervisor's subsequent "ratification" of another's conduct can form the basis for liability under § 1983.  *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Logan v. City of Pullman Police Dept.*, 2006 WL 1148727, *2 (E.D. Wash. 2006) (citing *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *rev'd on other ground*, 543 U.S. 194 (2004)).  The decision to ratify specific conduct, however, must approve both the subordinate's decision and the basis for it, and the ratification decision must be "the product of a 'conscious, affirmative, choice' to ratify the conduct in question."  *Haugen*, 351 F.3d at 393.  It must be a decision to ratify unconstitutional conduct.  *Logan*, 2006 WL 1148727, *4.  Importantly, the circumstances of the ratification must also

ORDER - Page 20

demonstrate that the supervisor had previously set in motion acts of others which caused the others to inflict a constitutional injury. *Larez*, 946 F.2d at 645-46.

Wickman's opinion that the police officers acted appropriately is not sufficient to constitute a ratification of any unconstitutional conduct that may have occurred at the scene of Peschel's arrest. Wickman's statement is not a conscious, affirmative choice to ratify unconstitutional conduct. It must be emphasized that Wickman's deposition was taken after Wickman had retired as Chief of Police. His retrospective opinion, stated as a retired private citizen, does not constitute conduct committed by a person acting under color of state law for purposes of § 1983 liability.

### 2.   <u>Mark Muir</u>

Mark Muir was the Assistant Chief of Police at the time Peschel was arrested. Muir, however, was off-duty at the time of the arrest. Nonetheless, Peschel's claim against Muir is based upon the fact Muir was responsible for the written policies of the Missoula Police Department in effect on the date of Peschel's arrest. Although Peschel does not elaborate on his claim against Muir, it appears he contends Muir should be held liable because the Department did not have a policy instructing officers on the proper protocol for responding to a crisis in the form of a suicide threat.

For the same reasons his claim against former Chief Wickman fails, Peschel's claim against Muir fails.  Peschel fails to present any evidence that establishes a causal connection between the lack of written policies for suicide intervention and the constitutional deprivations of which Peschel complains.

As a separate matter, Peschel contends Muir is liable for his role in the subsequent investigation of Peschel's case.  Muir assigned Lt. Chris Odlin to conduct an investigation of the Peggio Lane incident, and the loss of the video.  Muir reviewed Odlin's investigations and reports, and Muir did not find any problem with Odlin's investigations.  Pls.' SGI (Dkt. # 247) at ¶ 159.  Based on his past experience with Odlin, Muir had come to trust Odlin's ability to conduct a thorough evaluation or investigation of an incident, and his ability to report on the incident.  Depo. of Muir at 142.  Muir did not conduct any other investigation into the Peschel matters.

Peschel's argument regarding Odlin's investigation is limited.  He argues only that "[a] review of Odlin's reports demonstrates a lack of objectivity on Odlin's part."  Plaintiffs' Br. (Dkt. 240-2) at 23.  In reliance on *Poe v. Leonard*, 282 F.3d 123 (2nd Cir. 2002), Peschel simply asserts that a supervisor can be held liable for his subordinate's conduct if the supervisor fails to adequately investigate the subordinate's conduct.

ORDER - Page 22

In *Poe*, the court recognized that a supervisor can be liable under § 1983 for his or her failure to inquire about his subordinates or their actions.  *Poe*, 282 F.3d at 141.  For a supervisor to be held liable for failing to inquire into a subordinate's actions, however, the supervisor "must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior."  *Id*.  The plaintiff must identify facts suggesting the supervisor "knew or should have known that there was a high degree of risk [that a subordinate would commit a constitutional tort], but either deliberately or recklessly disregarded that risk" by failing to prevent the risk, and that the "failure caused a constitutional injury."  *Id*. at 142.

Peschel has not identified any facts that raise a genuine issue of material fact indicating Muir knew or should have known that any of his subordinates would inflict the constitutional injuries Peschel suffered.  *See Brown v. Michigan*, 2008 WL 920131, supra (requiring that supervisor must have had knowledge at a time when the conduct could be prevented, or that such conduct was otherwise foreseeable or predictable).  There is no evidence suggesting Muir's alleged failures with respect to Odlin's investigation caused any of Peschel's constitutional injuries.  Thus, the facts of this case do not support the imposition of liability on Muir under the authority of *Poe*.

ORDER - Page 23

For reasons of efficient and effective law enforcement operations, an officer is entitled to rely on information obtained from fellow law enforcement officers. *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005).

> [A]bsent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent.

*Motley*, 432 F.3d at 1081 (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2nd Cir. 1992)).

Peschel has not raised a genuine issue of material fact indicating Muir had any reason to believe Odlin's investigation was inadequate. Muir stated he had come to trust Odlin based on Odlin's past work. Absent a genuine issue of fact as to whether Muir knew Odlin's investigation was inadequate, Muir cannot be held liable. *See Motley*, 432 F.3d at 1081-82.

More importantly, Muir's conduct with respect to Odlin's investigation cannot have set in motion the acts of the officers on August 18, 2007, at Peggio Lane. Peschel has failed to demonstrate the requisite causal connection between Muir's subsequent review of Odlin's investigation, and the alleged violations of Peschel's rights on August 18 as asserted in this case. *See Anthony v. Vaccaro*, 43 F. Supp. 2d 843, 848 (N.D. Ohio 1999) (dismissing a claim against a supervisor alleging the supervisor failed to investigate police misconduct on the basis that a

failure to investigate does not demonstrate that the supervisor "either condoned, encouraged or knowingly acquiesced in the misconduct").

Finally, Peschel argues Muir is liable for subsequently ratifying the conduct and actions of the officers at the scene on Peggio Lane.  For the reasons discussed below, Peschel cannot sustain this claim.

Subsequent to the events on August 18, 2007, Muir expressed his approval of the Missoula police officers' conduct on that day.  When asked about the officers' response at the scene, Muir stated in his deposition that there was no "question in our minds that" the officers responded to the crisis situation appropriately.  Depo. of Muir at 138.  Muir confirmed that the officers involved at Peggio Lane were not "counseled, reprimanded or otherwise criticized for the way they handled the Peggio Lane incident[,]" and he stated that if a similar incident happened again he "would want the officers to conduct themselves in the same way[.]"  *Id*. at 171.

In addition to his deposition testimony, Muir previously drafted an opinion letter dated February 15, 2008, that purportedly was to be published in the Missoulian newspaper.  In the letter, Muir approved of the officers' conduct and performance in handling the difficult crisis situation involving Huguet and Peschel.  Defendants' Statement of Undisputed Facts  (Dkt. # 175), Ex. AA.

ORDER - Page 25

As discussed above, in limited circumstances, a supervisor's subsequent "ratification" of a subordinate's conduct can subject the supervisor to liability under § 1983.  *See Larez*, 946 F.2d at 646, supra.  Those circumstances, however, require more than a mere ratification by itself.  The supervisor must have set in motion the events and actions which led to the subordinate officers' violations of the plaintiff's constitutional rights.

In *Larez*, the plaintiff had filed a complaint with the Los Angeles Police Department alleging some of its officers committed an unlawful search of his home and used excessive force on him.  Los Angeles Chief of Police, Daryl Gates, responded with a letter informing the plaintiff that none of his allegations could be sustained.  Following the trial, a jury found Chief Gates liable in his individual capacity as a supervisor for ratifying the police department's investigation into the plaintiff's complaint, and for ratifying the officers' conduct of which the plaintiff complained.  *Larez*, 946 F.2d at 635.

The holding in *Larez*, however, is not based solely on Chief Gates' ratification and his letter to the plaintiff.  The evidence in that case demonstrated the police department had a long history of inappropriate and unacceptable police practices, policies, and procedures which Chief Gates endorsed and perpetuated prior to the events which gave rise to the plaintiff's complaint in *Larez*.  For

ORDER - Page 26

example, any time a complaint was filed against a unit of the police department Chief Gates would permit the unit that was the subject of the complaint to investigate the complaint.

Additionally, evidence was presented in *Larez* demonstrating that the police department had a history of consistently refusing to sustain citizen complaints about police officers' conduct.  *Larez*, 946 F.2d at 635.  The complaints were meaningless and the officers were routinely exonerated.  Due to the department's track record in reviewing citizen complaints, the plaintiff's expert found it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen."  *Id*.  Thus, the police department's customs and practices, and the tone set by Chief Gates encouraged the excessive use of force by officers.  *Id*. at 636, 647.

Chief Gates' ratification of the officers' excessive use of force imposed liability on him due to his prior conduct.  The evidence demonstrated that through Chief Gates' history of his prior endorsement and encouragement of police department customs and practices, and through his inappropriate investigation practices, Chief Gates "condoned, ratified, and encouraged the excessive use of force."  *Larez*, 946 F.2d at 646.  The history and course of conduct in which the police department and Chief Gates engaged provided Gates with notice of prior

ORDER - Page 27

constitutional violations which went unreprimanded.  The circumstances demonstrated that Chief Gates made a conscious choice not to discipline officers for constitutional violations, and not to establish new procedures to prevent future constitutional violations.  *Id*.  Thus, Gates had "set[] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others which he kn[e]w or reasonably should [have] know[n] would cause others to inflict the constitutional injury" of which the plaintiff complained.  *Id*.

In contrast to the circumstances in *Larez*, Peschel has not presented evidence of any prior conduct of Muir which set in motion the conduct of the officers at the scene of Peschel's arrest.  There exists no evidence of the requisite causal connection between Muir's subsequent approval of his officers' conduct and the prior events of August 18, 2007.  There is also no evidence that Muir's approval was "the product of a 'conscious, affirmative, choice' to ratify" the unconstitutional conduct in question.  *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003); *Logan v. City of Pullman Police Dept.*, 2006 WL 1148727, * (E.D. Wash. 2006).

A single decision by a supervisor not to reprimand a subordinate officer, without more, is not sufficient to establish the type of ratification that would lead to liability under § 1983.  *Logan*, 2006 WL 1148727, *3.  The Ninth Circuit

requires "something more than a failure to reprimand", by itself, to establish a ratification. *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003). Rather, a plaintiff must also show the supervisor "was deliberately indifferent to acts by others which he knew or reasonably should have known would cause others to inflict [plaintiff's] alleged constitutional injuries." *Logan*, at *4. "Without something more, [a supervisor's] discipline decisions *after* the incident does not satisfy this deliberate indifference standard." *Id*. (emphasis in original).

A plaintiff must additionally demonstrate that the decision not to discipline an officer "was a conscious, affirmative choice to ratify" the officer's unconstitutional conduct. *Logan*, at *4. The facts and circumstances must be sufficient to "indicate to any reasonable administrator" that a constitutional violation occurred. *Kanae*, 294 F. Supp. 2d at 1191; *Larez*, 946 F.2d at 636. Absent the type of acquiescence and ratification demonstrated in *Larez*, or evidence that a supervisor condoned the excessive use of force, liability against a supervisor for his approval of his officers' conduct cannot be sustained. *See Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1116 (E.D. Cal. 2005); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) (requiring "something more" than a mere failure to discipline).

ORDER - Page 29

For the reasons stated, Peschel has failed to establish that Muir committed a violation of their constitutional rights.  No further inquiry is necessary under the qualified immunity analysis, and Muir is entitled to dismissal from this action.

**3.     Gregg Willoughby, Wickman, and Muir - Attempted Recovery of the Lost Video**

Lt. Gregg Willoughby was a patrol lieutenant at the time of the events on August 18, 2007.  Willoughby was not at the scene on Peggio Lane as he was on vacation that day.  Peschel concedes that Willoughby was not responsible for supervising any of the officers who were at the scene on August 18, and that Willoughby did not personally participate in any of the events at the scene of Peschel's arrest.

Instead, Peschel includes Willoughby in similar allegations against Wickman and Muir stemming from their alleged negligent efforts in attempting to recover the lost video recording of Peschel's arrest.  Peschel contends their failed efforts to recover the video subjects them to supervisory liability for the excessive use of force on Peschel and the alleged denial of medical treatment to Peschel on August 18, 2007.  The Court disagrees.

Peschel complains that Wickman, Muir and Willoughby made minimal and inadequate efforts to try to retrieve the video.  Wickman permitted Mark Muir to remove the computer hard drive on which the video was stored.  Muir's removal

of the hard drive reduced the likelihood that the video could be recovered. Wickman also chose not to send the hard drive for forensic analysis.

Muir spent approximately 100 hours trying to find the video, yet he did not have adequate computer skills to be able to recover the video, and he did not have supervision from any Information and Technology personnel. Muir also authorized the expenditure of a mere $600 to have a third party conduct a remote access to the hard drive on which the video had been stored in an attempt to recover the video.

Peschel also notes that Muir was unable to determine whether any officers had tampered with the video, or whether someone had intentionally deleted the video. Nevertheless, Muir excluded the officers from suspicion so as to reassure them that he had faith in them and that he trusted them. Deposition of Mark Muir (February 11, 2009) at 165.

Willoughby was responsible for the video camera recording system used for storing and viewing videos taken from city police cars. Willoughby administrated the software and hardware system on which the video of Peschel's arrest was stored, and he had primary control over that system. The Peschel video was stored on a hard drive connected to Willoughby's computer which was located in a busy office accessible to many officers.

ORDER - Page 31

Peschel complains that Willoughby made a very limited effort to recover the lost video. Willoughby's efforts in that regard included his consultation with Muir regarding Muir's efforts to retrieve the lost video. Willoughby also participated in the decision to limit recovery efforts to only the remote examination of the computer. Peschel also argues that Willoughby failed to assure that there was an adequate backup system for the hard drive that stored the videos.

Wickman, Muir, and Willoughby's alleged negligence in failing to recover the video of Peschel's arrest is simply not causally connected to the events surrounding Peschel's arrest on August 18, 2007. Their subsequent efforts to recover the lost video did not set in motion the police officers' conduct on August 18. A supervising officer's conduct and independent acts or omissions which occur subsequent to the subordinate officers' violations of a plaintiff's constitutional rights cannot support liability against the supervisor. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). To impose liability against a supervisor the evidence must demonstrate that the supervisor "had knowledge of the offending employee's conduct *at a time when the conduct could be prevented*, or that such conduct was otherwise foreseeable or predictable." *Brown v. Michigan*, 2008 WL 920131, *6 (E.D. Mich. 2008) (emphasis added) (citing *Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992)).

ORDER - Page 32

Under its inherent authority, the Court has imposed an appropriate sanction on the City of Missoula for the spoliation of the video.  Peschel's argument that supervisory liability may be imposed on Wickman, Muir and Willoughby for failing to preserve the video is a veiled attempt to prosecute an independent tort for spoliation - a tort unavailable to Peschel under Montana law.  *Oliver v. Stimpson Lumber Co.*, 1999 MT 238, ¶¶ 32-34, 297 Mont. 336, 993 P.2d 11 (1999).  *See also* Dkt. # 72 at 27-28.

## III.   CONCLUSION

Absent a viable claim establishing Wickman, Muir and Willoughby violated Peschel's constitutional rights, no further inquiry is necessary for purposes of the qualified immunity analysis.  They are entitled to qualified immunity and are properly dismissed from this action.

**THEREFORE IT IS HEREBY ORDERED,** that the Supervising Officers' Motion for Summary Judgment is **GRANTED** and Wickman, Muir and Willoughby are **DISMISSED**.

DATED this 15th day of October, 2009.


 /s/ Jeremiah C. Lynch_____
Jeremiah C. Lynch
United States Magistrate Judge