# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

WALTER PESCHEL, M.D.,                    CV 08-79-M-JCL

           Plaintiff,

                             ORDER

    vs.

CITY OF MISSOULA, acting through the
Missoula Police Department,
MISSOULA CITY POLICE CHIEF RUSTY
WICKMAN, ASSISTANT CHIEF MARK MUIR,
LT. GREGG WILLOUGHBY, SGT. DANIEL JASON
HUNTSINGER, OFFICER CRAIG SERBA,
and OFFICER RYAN PRATHER,

           Defendants.

_____

This matter is before the Court upon "Defendant City of Missoula's Motion for Summary Judgment on 42 U.S.C. § 1983 Claims" filed pursuant to Fed. R. Civ. P. 56.  On August 11, 2009, the Court held a hearing on the motion.  For the reasons discussed below, the Court deems it appropriate to grant the motion.

## I.  INTRODUCTION

This action has its genesis in the August 18, 2007 arrest of Plaintiff Walter Peschel by officers of the City of Missoula, Montana Police Department.  Peschel was charged with, and prosecuted for, the misdemeanor offense of obstructing a

ORDER - Page 1

peace officer in violation of Mont. Code Ann. § 45-7-302.  Peschel was ultimately

acquitted of the charge by a jury.

Peschel commenced this action against the individual officers who

participated in Peschel's arrest, their superiors, and the City of Missoula.  Peschel

advances claims for relief under the Federal Civil Rights Act of 1871, codified at

42 U.S.C. § 1983, as well as Montana's Constitution and common law.  All of

Peschel's claims for relief are bottomed on three basic assertions:  (1) the officers

lacked probable cause to arrest Peschel - thus rendering his arrest unlawful; (2) the

officers used excessive force to effect the arrest; and (3) the officers deprived

Peschel of necessary medical treatment after the arrest.  To put Peschel's claims in

perspective, review of the circumstances surrounding the arrest is in order.

On August 18, 2007, Walter Peschel was mowing the lawn at an apartment

complex he owns in Missoula when tenant, Anna Martello, asked him for

assistance with another tenant, Julie Huguet.  Peschel, a medical doctor, found

Huguet in her car nearly unconscious from an apparent prescription medication

overdose.  Huguet had a gun and was threatening to commit suicide.  Peschel

engaged Huguet to dissuade her from taking her life - while directing Martello to

call 911.

ORDER - Page 2

Numerous City of Missoula police officers responded to the scene. The officers immediately ordered Peschel to get away from Huguet's car and out of the line of fire. Instead of complying with the officers' directive, Peschel asked the officers to assist him with Huguet. With their guns trained in the direction of Peschel and Huguet, the officers repeated their command that Peschel move away from Huguet's car. Again, Peschel would not move away from Huguet's car because Huguet had apparently told him she would shoot herself if he left.

The tension between Peschel and the officers escalated as Peschel, agitated by the manner in which the police responded to the situation, cursed at the officers. The standoff continued for approximately 46 minutes - the officers repeatedly ordering Peschel to move away from the car and Peschel refusing.

Eventually, Huguet lost consciousness and sloughed to the seat of the car. At that point, Peschel moved away from the car to the top of a nearby grassy knoll. From below, Officer Duncan Crawford ordered Peschel to come down the knoll. When Peschel did not immediately comply with Crawford's order, the commanding officer at the scene, Jason Huntsinger, issued the order to arrest Peschel. Officer Craig Serba responded by knocking Peschel down from behind causing him to fall down the grassy slope. Peschel states that during his arrest Officers Serba and Ryan Prather were on top of him, and that he felt someone knee

ORDER - Page 3

him in the back.  Peschel also asserts that either Serba or Crawford used a taser on him - the officers claim no taser was used.

Peschel claims he suffered various injuries during the course of the arrest. He complains that although emergency medical responders were at the scene, the officers failed to offer him necessary medical treatment - notwithstanding the fact that Officer Prather noticed that Peschel was panting and sweating after the arrest. Instead, according to Peschel, the officers placed him face down in a police car - leaving him there with windows rolled up and no air conditioning on a very hot day.

The events which occurred at the scene - including the conduct of Officers Serba and Prather in gaining physical custody of Peschel - were recorded by a video camera located in one of the police cars.  The video was eventually uploaded to the hard drive of a Missoula Police Department computer and viewed by several police officers in the days following the arrest.  At some point, however, the video was "lost", as were numerous other video recordings of unrelated police encounters.  The City of Missoula unsuccessfully attempted to retrieve the video through a forensic computer analysis.

Peschel seeks to impose liability directly on the City under § 1983 for the conduct of its officers in relation to the arrest of Peschel.  The City asserts it is

ORDER - Page 4

entitled to summary judgment upon Peschel's § 1983 claims.  For the reasons discussed below, the Court agrees with the City.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) entitles a party to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A party moving for summary judgment who does not have the burden of persuasion at trial, must produce evidence which either:  (1) negates an essential element of the non-moving party's claim, or (2) shows that the non-moving party does not have enough evidence of an essential element to ultimately carry his burden at trial.  *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  A party opposing summary judgment must identify evidence establishing that a dispute as to a particular material fact is genuine.  *Matsushita Electric Industrial*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opponent "must

do more than simply show that there is some metaphysical doubt as to the material

facts."  *Id*.  The party opposing the motion "may not rest upon the mere allegations

or denials of his pleading, but . . . must set forth specific facts showing that there is

a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

        An issue of fact is "genuine" if there is sufficient evidence for a reasonable

fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby Inc.*, 477

U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the

case.  *Id*. at 248.

        "In considering a motion for summary judgment, the court may not weigh

the evidence or make credibility determinations, and is required to draw all

inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*,

125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds as noted in Shakur*

*v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

### B.      Municipal Liability Under 42 U.S.C. § 1983 - Generally

        A county or municipal governmental entity, such as the City of Missoula,

qualifies as a "person" within the meaning of 42 U.S.C. § 1983, and can be sued

for damages under that statute.  *Monell v. Dept. of Social Services*, 436 U.S. 658,

690 (1978).  A local governmental entity, however, cannot be held liable under §

1983 on a *respondeat superior* theory of recovery merely by virtue of the conduct

of its employees.  *Board of County Commissioners of Bryan County v. Brown*, 520

U.S. 397, 403 (1997); *Monell*, 436 U.S. at 694.  Instead, a plaintiff must

demonstrate that the municipality *itself* acted deliberately or culpably, and that

there is a direct causal link between the municipality's action and the deprivation

of plaintiff's federal rights.  *Bryan County*, 520 U.S. at 404.

Liability can be imposed on a local governmental entity only for injuries

inflicted pursuant to an official governmental custom, policy, or practice, whether

established by the entity's "lawmakers or by those whose edicts or acts may fairly

be said to represent official policy[.]"  *Monell*, 436 U.S. at 693-94; *Shah v. County

of Los Angeles*, 797 F.2d 743, 747 (9th Cir. 1986).

The Ninth Circuit has explained there are generally three ways a plaintiff

can establish the existence of a municipality's unconstitutional custom, policy or

practice as follows:

> (1) by showing "a longstanding practice or custom which constitutes the
> 'standard operating procedure' of the local government entity"; (2) "by
> showing that the decision-making official was, as a matter of state law, a
> final policymaking authority whose edicts or acts may fairly be said to
> represent official policy in the area of decision"; or (3) "by showing that an
> official with final policymaking authority either delegated that authority to,
> or ratified the decision of, a subordinate."

ORDER - Page 7

*Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1155 (9th Cir.

2007).

> In addition, a local governmental entity may be liable if it has a "policy of
> inaction and such inaction amounts to a failure to protect constitutional
> rights." *Id*. at 1474 (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109
> S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Monell*, 436 U.S. at 690-91,
> 98 S.Ct. 2018.  The custom or policy of inaction, however, must be the
> result of a "conscious," *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197, or
> " 'deliberate choice to follow a course of action ... made from among
> various alternatives by the official or officials responsible for establishing
> final policy with respect to the subject matter in question.' " *Oviatt*, 954
> F.2d at 1477 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84,
> 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)).

*Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

A claimant must also prove that the municipality's custom, practice, or

policy was the "moving force" behind, or caused, the constitutional violation.

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507

U.S. 163, 166 (1993); *Plumeau v. School District #40*, 130 F.3d 432, 438 (9th Cir.

1997).

A "policy" which is sufficient to impose liability on a municipality under

*Monell* must reflect a conscious decision to adopt a particular course of action.

*Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008).  "[U]nder

*Monell*, a "policy" is "a deliberate choice to follow a course of action ... made

from among various alternatives by the official or officials responsible for

establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F3d 824, 834 (9th Cir. 2008).

Under *Monell*, a "custom" is described as "a practice [that] is so permanent[, widespread], and well-settled as to constitute a 'custom or usage' with the force of law [...] despite the absence of written authorization or express municipal policy." *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991) and *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### C.   Walter Peschel's Claims Under 42 U.S.C. § 1983

Walter Peschel advances federal claims against the City of Missoula under 42 U.S.C. § 1983.  In general, to establish that a defendant is liable for a claim under 42 U.S.C. § 1983 a "plaintiff must show '(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right.'"  *Harry A. v. Duncan*, 351 F. Supp. 2d 1060, 1072 (D. Mont. 2005) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  Section 1983 liability requires proof that a defendant's deliberate or affirmative act or omission caused the unconstitutional deprivation.  *Harry A.*, at 1072 (citing *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989)).  *See Daniels v. Williams*, 474 U.S. 327, 330-332

(1986) (concluding mere negligent conduct is insufficient for a claim under §

1983).

Peschel seeks to impose liability on the City of Missoula under 42 U.S.C. §

1983 for three alleged violations of his constitutional rights.  First, Peschel alleges

his arrest was unlawful.  Second, Peschel alleges the officers used excessive force

to effect his arrest.  Finally, Peschel asserts the officers failed to obtain necessary

medical treatment for him at the scene of his arrest.  These claims invoke rights

protected by specific provisions of the United States Constitution.  Specifically,

the Fourth Amendment to the United States Constitution protects individuals

against unlawful arrest and the excessive use of force.  *See Graham v. Connor*,

490 U.S. 386, 395 (1989) (excessive use of force) and *Saucier v. Katz*, 533 U.S.

194, 204 (2001) (same); and *Galbraith v. County of Santa Clara*, 307 F.3d 1119,

1127 (9th Cir. 2002) (unlawful arrest).  The Due Process Clause of the Fourteenth

Amendment, in turn, protects the right of a pretrial detainee to receive necessary

medical care and treatment for injuries.  *Conn v. City of Reno*, 572 F.3d 1047,

1054 (9th Cir. 2009).

### D.    Unlawful Arrest

The City claims it is entitled to summary judgment with respect to Walter

Peschel's § 1983 claim of unlawful arrest because the arresting officers had

ORDER - Page 10

probable cause to arrest Peschel for the misdemeanor offense of obstructing a peace officer in violation of Mont. Code Ann. § 45-7-302.  Peschel retorts that he was not obstructing the officers in the performance of their duties, but was actually assisting them to save Julie Huguet.  In the alternative, Peschel argues that genuine issues of material fact exist as to whether probable cause did, in fact, exist to arrest Peschel for obstruction.

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964-65 (9th Cir. 2001) (citation omitted).  In determining whether an arrest was lawful under the Fourth Amendment, "[f]ederal law asks only whether the officers had probable cause to believe that the predicate offense, as the state has defined it, has been committed." *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001).  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Probable cause exists "when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe

ORDER - Page 11

that an offense has been or is being committed by the person being arrested."

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*,

379 U.S. 89, 91 (1964)).  Stated another way, probable cause exists when "under

the totality of circumstances known to the arresting officers, a prudent person

would have concluded that there was a fair probability that [the defendant] had

committed a crime."  *Id*. (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th

Cir. 1986)).  The standard for probable cause is an objective one - the "arresting

officer's state of mind (except for the facts that he knows) is irrelevant to the

existence of probable cause..."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)

(citations omitted).

The state law at issue is Mont. Code Ann. § 45-7-302 which defines

obstructing a peace officer as follows:

> (1) A person commits the offense of obstructing a peace officer or public servant if the person knowingly obstructs, impairs, or hinders the enforcement of the criminal law, the preservation of the peace, or the performance of a governmental function, including service of process.

The undisputed facts of record establish that the on-the-scene officers had

probable cause to arrest Walter Peschel for the misdemeanor offense of

obstructing a peace officer.[1]  While probable cause is generally a question for the

---

[1]Peschel has suggested the Court should find the arrest was unlawful as a sanction for the spoliation of the video recording of the events surrounding

jury, summary judgment is appropriate if no reasonable jury could find that the officers did not have probable cause to arrest. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984). Based upon the undisputed facts of record in this case, no reasonable jury could find that the officers did not have probable cause to arrest Peschel for obstruction.

On the morning of August 18, 2007, the Missoula Police Department received a call relating to the welfare of Julie Huguet. Officers dispatched to Huguet's apartment in the complex owned by Peschel did not locate Huguet, but found a note presumed to be a suicide note. Later in the day, Anna Martello phoned 911 and advised that Huguet was now at the apartment complex, that she was drunk and had a gun.

In his criminal trial Peschel testified that one of the first officers on the scene kept repeating to him "over and over, 'Step aside, stand aside.'" Dkt. # 247 at ¶ 31. He also testified that Officer Kazinsky told him "to leave." *Id*. Peschel

---

Peschel's arrest. While the Court has imposed such a sanction with respect to Peschel's claim of excessive use of force in making the arrest, it would be improper to do so with regard to the unlawful arrest claim. In determining the propriety and severity of sanctions a court must consider the "materiality and value of the suppressed evidence[.]" *Gates Rubber Co. v. Bando Chemical Industries, Ltd*., 167 F.R.D. 90, 104 (D. Colo. 1996). Because the undisputed facts establish that Peschel was obstructing the police officers in violation of Mont. Code Ann. § 45-7-302 the loss of the recordation of the events - as they pertain to his refusal to obey the lawful orders of the police - is of no consequence.

ORDER - Page 13

concedes that during his first few exchanges with Officer Kazinsky the officer "asked me to move away[,]" but Peschel did not comply with the request.  Peschel also testified in a deposition that officers told him to "move away", that he was "obstructing [the officers'] ability to do [their] jobs", and that he was "obstructing justice".  Deposition of Walter Peschel, M.D. (May 6, 2009) at 148.  Peschel also concedes that he knew the officers wanted him to move away from Huguet's vehicle - "Oh, I understood that very well, I understood that from the very beginning that they wanted me to step aside."  Depo. of Peschel at 312.

Finally, it is undisputed that Peschel did not comply with the directives of the officers for a period of approximately 46 minutes.  When Peschel finally moved away from Huguet's vehicle and to the nearby grassy knoll, commanding Officer Huntsinger ordered Peschel arrested.  In response, Officer Serba knocked Peschel to the ground and he was ultimately taken into custody.

Against this backdrop, Peschel nonetheless argues that the officers had no reasonable basis to believe that Peschel had and was continuing to obstruct their efforts at the point in time he was arrested.[2]  The primary focus of Peschel's

---

[2]In reliance on *City of Kalispell v. Cameron*, 46 P.3d 46 (Mont. 2002), Peschel argues that a person cannot be arrested under Montana's obstruction statute for simply refusing to obey an officer's orders and using profanity.  Peschel misreads *Cameron* which is inapposite to the circumstances presented here.  The holding in *Cameron* was premised upon the officer's testimony that Cameron did

argument is that as a medical doctor working to prevent Julie Huguet from committing suicide, he was actually assisting rather than obstructing, impairing or hindering the officers in assisting Huguet.  Peschel maintains that his status as a doctor - a fact known to the officers - is a "critical factor" in the probable cause analysis.  The essence of Peschel's argument is that the officers should have deferred to Peschel's determination as to the best course of action to address and diffuse the dangerous situation presented.

The Court does not doubt the good intentions of Peschel nor the valor he exhibited.  Indeed the course of action he chose may have been the best for Julie Huguet.  Nonetheless those efforts do not translate into a lack of probable cause to arrest Peschel - thus subjecting the officers to personal liability for an unlawful arrest.  Undoubtedly a vigorous debate could be had as to the best tactical response to be employed in responding to the situation which faced both Peschel and the officers.  The fact remains - and Peschel does not dispute - the officers were vested with the lawful authority to secure the scene and preserve the peace in the manner they deemed appropriate under the circumstances.  Peschel impeded their ability to do so.  While perhaps the officers should have deferred to Dr. Peschel, they were

_____

not impair the officer's ability to arrest Cameron's companion.  *Id*. at 47.

ORDER - Page 15

not obligated to do so and cannot be held liable for an unlawful arrest because Peschel cites no authority suggesting otherwise.

Peschel argues, at great length, that a doctor/patient relationship had been established between Peschel and Huguet which, Peschel argues, ethically precluded him from leaving Huguet.  His dilemma most likely bore upon the issue of intent in his criminal trial - resulting in the jury's acquittal.  But in this case he is seeking to impose personal liability upon the officers for performing their lawful duties.  While the Court respects the conundrum that was facing Peschel, the Fourth Amendment calculus does not change.

Peschel's argument runs afoul of the well-recognized principle that "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001) (citations omitted).  As explained by the Court in *Atwater*, "[T]he Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest..." *Atwater*, 532 U.S. at 347; *See New*

ORDER - Page 16

*York v. Belton*, 453 U.S. 454, 458 (1981) (Fourth Amendment rules "'ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged'" and not "'qualified by all sorts of ifs, ands, and buts'").

Peschel presents a cursory argument that the arrest was "unconstitutional" because it was made simply in retaliation for Peschel having failed to obey the officers' orders and for hurling profanities at the officers.  Peschel cites *Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002) for support - apparently suggesting the officers acted in retaliation for Peschel's exercise of his First Amendment right to free speech.  At the time *Greene* was decided, there existed a circuit split on the issue of whether a plaintiff was or was not required to prove an absence of probable cause to go forward on a retaliatory prosecution claim.  *Izen v. Catalina*, 398 F.3d 363, 368 n.7 (5th Cir. 2005).  *Greene* adopted the view that a plaintiff did not have to prove a lack of probable cause to succeed in a retaliatory prosecution claim.  310 F.3d at 895.   Since the time of *Greene*, the Supreme Court addressed the issue in the context of a *Bivens* action and held that a plaintiff in a retaliatory-prosecution action <u>must</u> plead and show the absence of probable cause for pressing the underlying criminal charges.  *Hartman v. Moore*, 547 U.S. 250, 266 (2006).  The Court made clear the same rationale would control in § 1983 cases.

ORDER - Page 17

*Id*. at 261.  This conclusion is consistent with the principle that an "arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  *Devenpeck*, 543 U.S. at 153 (citations omitted).[3]

Finally, under the doctrine of collateral estoppel, Peschel suggests his acquittal on the charges bars a conclusion that the officers had probable cause to arrest him.  At the August 11, 2009 hearing, however, Peschel conceded that the probable cause standard is substantively different from the standard of proof in a criminal case, i.e. beyond a reasonable doubt.  Nonetheless, Peschel maintained that his acquittal would still constitute evidence relevant to the issue of whether probable cause existed.

Collateral estoppel and Peschel's acquittal do not bar the Court's conclusion that the officers had probable cause to arrest Peschel.  Collateral estoppel requires, in part, that the identical issue raised in this case must have previously been decided in a prior adjudication.  *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 18, 331

---

[3]Peschel also claims that the arrest was improper under Mont. Code Ann. § 46-6-311(1) because there was no immediate need to arrest Peschel.  Section 46-6-311 allows a peace officer to make a warrantless arrest if the officer has "probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require an immediate arrest." Aside from the fact the existing circumstances justified Peschel's immediate arrest, state restrictions or limitations on arrests do not alter the reasonableness inquiry under the Fourth Amendment.  *Virginia v. Moore*, 128 S. Ct. 1598, 1606 (2008).

ORDER - Page 18

Mont. 281, 130 P.3d 1267 (2006).  The standard of proof in a criminal trial -

requiring proof beyond a reasonable doubt that a defendant committed a crime - is

irrelevant to the issue of probable cause which considers whether there is a fair

probability that the defendant committed a crime.  *See Illinois v. Gates*, 462 U.S.

213, 235 (1983).  Consequently, the issue resolved by Peschel's acquittal is not

identical to the issue of probable cause for his arrest.[4]

### E.    Liability of City of Missoula under 42 U.S.C. § 1983

#### 1.    Ratification by Chief of Police

Peschel argues that the City of Missoula is liable under § 1983 because

former Chief of Police, Rusty Wickman, actually ratified the conduct of the on-

the-scene officers.  Wickman's alleged ratification on which Peschel relies,

however, is insufficient to impose liability on the City of Missoula.

A municipality can be held liable under § 1983 "by showing that an official

with final policymaking authority [...] ratified the decision of[] a subordinate."

*Rosenbaum*, 484 F.3d at 1155.  *See also Pembaur v. City of Cincinnati*, 475 U.S.

469, 481 (1986) and *Trevino*, 99 F.3d at 920.  The official with final policymaking

authority must ratify both the "subordinate's decision or action and the basis for

---

[4]Although he could have, Peschel did not request a preliminary hearing on
his obstruction charge which would have inquired into the issue of probable cause
for his arrest.

ORDER - Page 19

it." *Trevino*, 99 F.3d at 920 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).  A person with policymaking authority who ratifies a subordinate's conduct can constitute one of the rare situations where an isolated incident may be sufficient to impose liability on a municipality.  *Trevino*, 99 F.3d at 918 n.2.; *Christie v. Iopa*, 176 F.3d 1231, 1235, 1238 (9th Cir. 1999).

The issue of whether any particular "official has final policymaking authority is a question for the court to decide based on state law."  *Christie*, 176 F.3d at 1235 (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)).  Absent evidence establishing that the particular individual had final policymaking authority, the municipality cannot be subject to § 1983 liability for that person's "ratification" of prior conduct.  *See e.g. Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002) (concluding that the evidence did not establish that the particular official held the position of "Director of Health" and, thus, did not establish that the official was the final policymaking authority with respect to the decision at issue).

In support of the ratification theory, Peschel relies solely on the deposition testimony of Wickman.  When asked whether, in retrospect, it was his opinion that "the officers at the scene of Peggio Lane handled the incident the way the Missoula Police Department would have wanted them to handle the situation[,]"

ORDER - Page 20

Wickman stated:  "To the best of my knowledge, yes."  Deposition of Rusty

Wickman (March 12, 2009) at 188 (Dkt. 247-4 Ex. 12).

At the time of Wickman's deposition, however, he was no longer the Chief

of Police.  Wickman served as the Chief of Police from May 2005 until May 2008

when he retired.  Wickman Depo. at 19 (Dkt. # 175-12 page 4 of 23).  As of

Wickman's March 12, 2009 deposition he was still retired.  *Id*.  Therefore,

Wickman did not, as a matter of state law, possess final policymaking authority on

behalf of the City of Missoula at the time he allegedly ratified the officers'

conduct during his deposition.  In accordance with *Pembaur* and *Ulrich*, supra,

Wickman's testimony on March 12, 2009, cannot constitute official ratification for

purposes of imposing § 1983 liability on the City of Missoula.

## 2. <u>Rusty Wickman's Promotion of Jason Huntsinger</u>

During his tenure as Chief of Police, Wickman made the decision to

recommend Jason Huntsinger's promotion to sergeant in 2006.  Peschel argues the

City of Missoula is liable for the officers' alleged violations of his rights

committed on August 18, 2007, by virtue of Wickman's role in promoting

Huntsinger in 2006.

ORDER - Page 21

In general, and as discussed above, the evidence must demonstrate that the specific alleged deprivation of a constitutional right must be attributable to the municipality.  Accordingly,

> [w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*Bryan County*, 520 U.S. at 405.  "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation[.]"  *Id*. at 406.  Where a plaintiff seeks to establish that a municipal action has led an employee to violate the plaintiff's constitutional rights, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  *Id*. at 407.  Simple negligence, or even heightened negligence is not sufficient.  *Id*.

A § 1983 claim premised on a government official's inadequate review of a prospective applicant's record presents "a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself."  *Bryant County*, 520 U.S. at 410.  Theoretically, every injury could be traced to an employment decision in a "but-

ORDER - Page 22

for" sense.  *Id*.  Therefore, "[t]o prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."  *Id*.  Consequently, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."  *Id*. at 411.

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Id*.  A finding of the requisite culpability "depend[s] on a finding that *this* [inadequately screened] officer was highly likely to inflict the *particular* injury suffered by the plaintiff."  *Id*. at 412 (emphasis in original).  There must exist a strong connection between the officer's background and the specific constitutional violation at issue, i.e. based on the officer's background the specific constitutional violation must be "a plainly obvious consequence of the hiring decision."  *Id*.

Regardless of whether a hiring official "failed to examine [a candidate's] record, partially examined it, or fully examined it, [the official's] hiring decision could not have been 'deliberately indifferent'" unless in light of that record [the candidate's specific unconstitutional conduct] would have been a plainly obvious

ORDER - Page 23

consequence of the hiring decision." *Bryant County*, 520 U.S. at 415.  In *Bryant*, the employee's background including misdemeanor convictions for assault and battery, resisting arrest, public drunkenness, nine traffic violations, driving with a suspended license, and being in actual physical control of a vehicle while intoxicated.  *Id*. at 414.  The Court concluded that these convictions did not provide sufficient evidence to support a finding that the hiring official's decision "reflected [a] conscious disregard of an obvious risk that a use of excessive force [by the hired employee] would follow."  *Id*. at 415.

In this case, Peschel must raise a genuine issue of material fact suggesting that the excessive use of force, and the deprivation of medical care, allegedly committed by officers under Jason Huntsinger's command on August 18, 2007, in violation of Peschel's constitutional rights, would have been a plainly obvious consequence of Wickman's decision to promote Huntsinger to sergeant in 2006. Under the circumstances of this case, the Court finds Peschel has failed to present sufficient evidence to satisfy the rigorous standards of culpability and causation discussed above.

Before Huntsinger was employed by the Missoula Police Department, he was employed as a police officer in Downey, California.  Huntsinger resigned from that job, however, due to the police department's investigation into his

ORDER - Page 24

conduct as a police officer.  The investigation in Downey found that Huntsinger

had inappropriately required female victims to partially disrobe so he could take

pictures of them, that Huntsinger mishandled evidence by keeping the photographs

of the partially nude victims in his police locker, and that Huntsinger had lied

during the Downey investigation.  Peschel argues Huntsinger was not fit to be a

police officer, and was not competent to serve as a commanding officer.

Therefore, Peschel contends Wickman's decision to promote Huntsinger in 2006

is sufficient to impose liability on the City of Missoula for the violations of

Peschel's constitutional rights which allegedly occurred on August 18, 2009, on

Peggio Lane.

Regardless of whether Wickman was fully aware of Huntsinger's history in

Downey, California in 2006, Peschel has failed to raise a genuine issue of material

fact suggesting Huntsinger's history made it plainly obvious that officers under

Huntsinger's command in August 2007 would violate Peschel's constitutional

rights.[5]  Similar to the employee's history in *Bryant County*, Huntsinger's prior

---

[5]It is undisputed that Huntsinger did not have any personal, physical contact
with Peschel during his arrest, or while Peschel was being escorted to a police car.
As the commanding officer, Huntsinger merely ordered Peschel to step away from
Huguet's car, and he later ordered the other officers to arrest Peschel.  Huntsinger
did not direct the other officers as to how to effect Peschel's arrest, the amount of
force they should use, or whether they should provide medical treatment to
Peschel.

conduct in taking pictures of partially nude victims, keeping those pictures in his

locker, and lying to Downey investigators would not have made it plainly obvious

in 2006 that Huntsinger would allow other police officers to use excessive force in

effecting Peschel's arrest, or to deprive Peschel of medical treatment.

Accordingly, Peschel has failed to establish that the City of Missoula is liable by

virtue of Wickman's promotion of Huntsinger in 2006.

### 3.   Longstanding Customs or Policies of the City of Missoula

#### a.   Failure to Reprimand Officers for Violating Peschel's Constitutional Rights

Peschel contends the City of Missoula is liable for failing to take any

remedial measures, or to reprimand the officers who allegedly violated Peschel's

constitutional rights.  It is undisputed that the City of Missoula did not reprimand

or discipline any of the officers involved in Peschel's arrest on August 18, 2007.

Accordingly, Peschel asserts the City's failure to reprimand the officers following

the incident at Peggio Lane "amounted to an unwritten City policy condoning

unlawful arrest, the excessive use of force, the failure to provide medical care, and

the failure to preserve evidence."

_____

ORDER - Page 26

In the absence of a formal municipal policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)). A plaintiff must establish that the custom or practice is "so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino*, 979 F.2d at 918 (quoting *Monell*, 436 U.S. at 691). Accordingly,

> [l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.

*Trevino*, 99 F.3d at 918 (citations omitted). However, absent additional facts demonstrating the existence of a municipal custom or policy under *Trevino*, a "single failure to discipline" officers, by itself, cannot give rise to a municipality's liability under *Monell*. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003).

Peschel has failed to present evidence demonstrating that the City of Missoula had a longstanding custom or practice of refusing to reprimand officers for either the alleged excessive use of force or the deprivation of medical care. Peschel's assertion - that the City of Missoula failed to reprimand the officers involved in the Peggio Lane incident - is of only a single, isolated occasion where

ORDER - Page 27

the City failed to reprimand its police officers.  Peschel has not presented any

evidence suggesting the City of Missoula had a persistent and widespread custom

or practice, with the requisite duration, frequency, or consistency, of refusing to

reprimand police officers for misconduct.

Even in the absence of a custom or policy, under certain limited

circumstances a single decision of a municipal policymaker which ratifies or

approves of the conduct of a municipal employee could form the basis of liability

under *Monell*.  *See Haugen*, at 393 (citations omitted).  Those limited

circumstances, however, require that the policymaker must have specifically

approved of both the subordinate's decision and the basis for the decision, and the

plaintiff must establish that the policymaker's decision "was the product of a

'conscious, affirmative choice' to ratify the conduct in question."  *Id*. (citing *St.*

*Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) and *Gillette v. Delmore*, 979 F.2d

1342, 1347 (9th Cir. 1992)).

Peschel also has not presented any evidence that would support *Monell*

liability as discussed in *Haugen*.  Peschel has not identified any specific decision

made by any City of Missoula policymaker who expressly, consciously, and

affirmatively chose not to reprimand the officers who were at the scene on Peggio

Lane.  There is no evidence of any decision declining to discipline the officers, or

ORDER - Page 28

that any such decision was based on a policymaker's approval of both the officers'

conduct, and the basis for the conduct.

### b.    Custom or Practice of Inaction and Failing to Discipline

Peschel argues the City of Missoula is liable by virtue of its alleged custom

and practice of failing to take action against its police officers in response to

allegations of police misconduct.  Peschel contends the City has a practice of

"turning a blind eye" to police officers' violations of citizen's constitutional rights.

The Missoula Police Department assigned Lt. Chris Odlin to investigate the

Peggio Lane incident, the loss of the video, and the discharge logs on the taser

guns the officers had at the scene of the incident.  Peschel contends Odlin's

investigation was inadequate, misguided, inappropriate, and biased.  Odlin

allegedly asked leading questions of witnesses, and suggested to witnesses that

Peschel's conduct was inappropriate and that the police officers acted

professionally, responsibly, and appropriately.

Peschel also complains about how Lt. Odlin conducted his investigation of

the taser guns the officers had at the Peggio Lane scene.  Peschel contends Lt.

Odlin attempted to consult with a TASER company representative to determine

how to manipulate the taser data reflecting the times when the tasers discharged.

ORDER - Page 29

Even assuming Lt. Odlin's investigation of the Peggio Lane incident was defective as Peschel asserts, a single faulty investigation is insufficient to demonstrate the City engaged in a longstanding custom, policy, or practice of performing inadequate investigations for the purpose of turning a blind eye to, or condoning violations of citizens' constitutional rights. *See Trevino*, 99 F.3d at 918 (single, isolated incidents do not support liability under *Monell*). Peschel does not present any evidence of any other investigation conducted by the City which he contends was inadequate. Peschel has not presented any evidence indicating the City conducts inadequate investigations "of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*.

Peschel also challenges the City of Missoula's characterization of Officer Serba's conduct in effecting Peschel's arrest. Peschel complains that the City inappropriately minimizes the level and severity of the physical contact Serba made with him during the arrest. The City's characterization of Serba's conduct in this isolated incident, however, is insufficient to demonstrate a custom, policy or practice of minimizing an officer's conduct.

Next, Peschel raises the issue of how the City, its Chief of Police, and the Department's police officers have minimized Huntsinger's behavior and conduct

ORDER - Page 30

which led to his federal criminal conviction for receipt of obscene material in

violation of 18 U.S.C. § 1462.  Peschel believes, without evidentiary support, that

the City, through its official policymakers, has inappropriately supported

Huntsinger despite its knowledge of Huntsinger's criminal activity.  Peschel

suggests the evidence regarding the City's treatment of Huntsinger demonstrates

the City's custom and practice of protecting the brotherhood of police officers by

overlooking police misconduct.  Again, even if true, the City's isolated reaction to

Huntsinger's criminal activity, which only became known to the City after the

Peggio Lane incident, does not establish a custom, policy, or practice of ignoring

police misconduct.

Peschel also challenges the City's statistics regarding citizen complaints of

its police officers' conduct.  The City represents that from January 1, 2000,

through June 2008, the Missoula Police Department responded to 276,711 calls

for service.  From those calls the Missoula Police Department received 44 citizen

complaints of alleged excessive use of force, 1 citizen complaint of alleged denial

of medical care, and 7 citizen complaints of alleged unlawful arrest.  These 52

complaints, therefore, arose from only 0.02% of the 276,711 calls for service.

Although the number and percentage of complaints is minimal, based on these

statistics Peschel asserts, without any evidentiary support, that the City's

ORDER - Page 31

"investigations are intentionally so biased that wrongdoing can never be found." These insignificant statistics, over an eight and one-half year period, do not demonstrate a custom, practice, or policy of ignoring wrongdoing.

Peschel also contends the City has engaged in a practice of requiring a criminal defendant to release the City of Missoula and the Missoula Police Department from liability when the City offers the defendant a deferred prosecution on charges pending against the defendant.  Peschel speculates that the City avoids claims of wrongful arrest or the excessive use of force by offering the deferred prosecution and securing a release.

Peschel, however, does not offer any evidence or statistics describing the circumstances under which the City offers the deferred prosecutions and secures a release.  Peschel's argument would have some merit if he presented evidence demonstrating that many of the deferred prosecutions and releases are arranged in situations where the defendant alleges that the police officers used excessive force against him, or unlawfully arrested him.  Peschel, however, does not identify any evidence in support of his argument, and his mere allegations and speculation on the matter are not sufficient to raise a genuine issue of material fact in opposition to summary judgment. *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

ORDER - Page 32

Next Peschel complains about two incidents of police misconduct where the City of Missoula allegedly turned a blind eye and failed to address the incidents appropriately.  First, Peschel refers to an incident where an officer used a taser on an individual who was handcuffed and already in a patrol car.  Peschel complains that the City of Missoula punished the officer by merely requiring him to research the psychological and physiological phenomena of how stress affects a person's memory of an event.

The City of Missoula responds explaining that the officer in the referenced tasing incident was, in fact, reprimanded.  The City explains that the investigation of that officer was initiated by the Missoula Police Department, not by a citizen complaint.  The Missoula Police Department issued a Level 2 letter of reprimand to the officer in accordance with the collective bargaining unit principles of progressive discipline, and the letter was placed in the officer's file.  Affidavit of Mark Muir (July 20, 2009) at ¶ 7 (Dkt. # 272-2).  The Missoula Police Department also required the officer to research the physiological and psychological impacts that stress has on a person's memory because the officer had inaccurately remembered the events of the situation where he unnecessarily used the taser.  *Id*. at ¶ 8.  The officer grieved the disciplinary action taken against him, but the then Chief of Police, Rusty Wickman, denied the officer's grievance.  *Id*. at ¶ 9.

ORDER - Page 33

Following that taser incident the Missoula Police Department made changes to its taser policy to reduce the likelihood that an officer would use a taser absent exigent circumstances, and it trained its officers on the policy changes. *Id*. at ¶ 10.

The second incident to which Peschel refers involved a citizen complaint filed against Officer Serba in April 2008, after the events at Peggio Lane. The complaint alleged Officer Serba broke a juvenile's nose by hitting his face against a patrol car, and that Serba also administered a alcohol breath test to the minor without the consent of the minor's parents.

The Missoula Police Department investigated the complaint against Serba. With respect to the minor's broken nose, the Department concluded the evidence was insufficient to clearly prove or disprove the allegations in the citizen's complaint. Aff. of Muir at ¶¶ 16, 18. Serba's administration of a breath test on a minor without parental consent, however, constituted a violation of police department policy. *Id*. at ¶ 15. Accordingly, the complaint against Serba was "sustained", meaning the preponderance of the evidence proved the allegations in the citizen's complaint. *Id*. at ¶¶ 15, 18. Therefore, contrary to Peschel's assertion, Serba was not "exonerated" with respect to the referenced complaint. *Id*. at ¶¶ 17, 18.

ORDER - Page 34

These two incidents of misconduct to which Peschel refers, one of which occurred after the Peggio Lane incident, do not reflect the existence of a City custom, policy or practice, as of August 2007, of failing to discipline officers for misconduct. The Missoula Police Department disciplined the officers in the two referenced incidents.

**c.     Failure to Train**

Peschel asserts the City of Missoula is liable for its failure to adequately train its officers. Specifically, he contends the City failed to train its officers with respect to the proper procedure for responding to a suicide crisis situation. He argues that the officers' response to Huguet's suicidal intentions was inappropriate and detrimental to his own effort to prevent her suicide and secure the scene. Peschel argues the officers arrived at the scene with their sirens on, and spoke loudly to Peschel. He asserts the officers' conduct agitated and frightened Huguet.

Additionally, Peschel argues that the City failed to have officers who were trained in Crisis Intervention Training (CIT), or crisis negotiations, dispatched to the scene at Peggio Lane on August 18, 2007. Peschel apparently suggests that those properly trained officers would have been more effective or efficient at resolving Huguet's crisis peacefully.

First, the City's failure to have its CIT-trained officers or crisis negotiators at the scene on August 18, 2007, amounts to only a single, isolated incident which is not sufficient to support liability under *Monell*. *Trevino*, 979 F.2d at 918. Peschel has not presented any evidence suggesting that the City engaged in a custom, policy, or practice of failing to send CIT trained officers to crisis or suicide calls.  Peschel does not even attempt to argue that the City's practice in this regard was "so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino*, 979 F.2d at 918 (quoting *Monell*, 436 U.S. at 691).  The City's failure to utilize properly trained officers at a single incident does not demonstrate the requisite "duration, frequency and consistency" of a particular practice necessary to impose liability on a municipality.  *Id*.

With respect to Peschel's argument that the City failed to provide proper crisis training to the officers who were at the scene on Peggio Lane, the assertion fails for lack of evidence to support the requisite culpability and causation necessary under *Monell*.  Under certain circumstances "where the city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants[,]" a municipality's failure to train its officers can constitute a policy

ORDER - Page 36

sufficient to support liability under *Monell*.[6]  *City of Canton v. Harris*, 489 U.S.

378, 392 (1989).

> A local governmental entity's failure to train its employees can also create §
> 1983 liability where the failure to train "amounts to deliberate indifference
> to the rights of persons" with whom those employees are likely to come into
> contact.  *City of Canton*, 489 U.S. at 388-89, 109 S.Ct. 1197.  "[F]or
> liability to attach in this circumstance the identified deficiency in a [local
> governmental entity's] training program must be closely related to the
> ultimate injury."  *Id*. at 391, 109 S.Ct. 1197 (emphasis added).  In other
> words, a plaintiff must show that his or her constitutional "injury would
> have been avoided" had the governmental entity properly trained its
> employees.  *Oviatt*, 954 F.2d at 1474 (citing *City of Canton*, 489 U.S. at
> 389-91, 109 S.Ct. 1197).

*Lee*, 250 F.3d at 681.

The issue of causation is significant in establishing liability for a city's

failure to train.  A plaintiff must establish that the alleged deficiency in training

"actually caused the police officers'" conduct in question.  *City of Canton*, 489

U.S. at 391.

_____

> [6]A failure to train can represent a "city policy" where,
>
> in light of the duties assigned to specific officers or employees[,] the need
> for more or different training is so obvious, and the inadequacy so likely to
> result in the violation of constitutional rights, that the policymakers of the
> city can reasonably be said to have been deliberately indifferent to the need.
> In that event, the failure to provide proper training may fairly be said to
> represent a policy for which the city is responsible, and for which the city
> may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

ORDER - Page 37

Peschel's § 1983 claims advanced against the City of Missoula allege that its police officers used excessive force on Peschel and deprived him of medical treatment.  Peschel has failed to identify facts which support the requisite causal connection between the City officers' lack of training with respect to suicide or crisis situations, and their use of excessive force in effecting an arrest or their failure to provide medical treatment to an arrestee.  Had the City failed to train its officers on the use of force and the provision of medical treatment, those failures would be causally connected to Peschel's claims.  Peschel fails, however, to establish how the absence of training on suicide or crisis situations actually and directly caused officers to use excessive force on Peschel and deprive him of medical treatment.  At best, Peschel speculates that with proper crisis training, the tension at the scene would not have escalated to such a degree resulting in Peschel's physical arrest.  Peschel's speculation on this matter, however, is not sufficient to establish the requisite causal connection to oppose summary judgment.  *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).  Further, Peschel fails to recognize that his own conduct, as discussed above, provided probable cause for the officers to place him under arrest.

ORDER - Page 38

**d.**   **Failure to Provide Medical Treatment**

Peschel contends the City of Missoula is liable under § 1983 for the officers' failure to provide medical treatment to Peschel after he was arrested. Peschel, however, fails to identify facts establishing the City of Missoula had a custom, policy, or practice of failing to provide medical treatment to arrestees. Instead, they rely upon the fact that the City had policies in place which required its officers to provide medical care to arrestees as necessary.  Peschel identifies various Missoula Police Department policies which require police officers to provide medical treatment to individuals in need of medical assistance. Specifically, the Missoula Police Department policies require officers to be alert to the medical condition of a person who has been tasered.  Officers are cautioned to watch for signs of breathing difficulties, profuse sweating, and loss of consciousness, and if a detainee who has been tasered exhibits those symptoms the police department policy requires officers to seek immediate medical attention for the detainee.

Peschel argues that the officers failed to provide medical treatment to him in contravention of the City's custom, policy or practice.  Peschel contends that either Officer Serba or Officer Crawford used a taser on him, and Officer Prather noticed that Peschel was "panting and sweating."  Consequently, City policy

ORDER - Page 39

required the officers to provide immediate medical attention to him, yet Peschel argues the officers failed to comply with the applicable policy.

Peschel's argument misses the point.  The existence of the referenced policies and the officers' purported failure to follow them do indeed bear upon the claims of negligence under state law leveled against the officers individually and the City via respondeat superior.  The fact the officers may have acted contrary to the referenced policy on this occasion does not, as suggested by Peschel, translate into an official policy, custom or practice of the City - the essential prerequisite to imposition of § 1983 liability upon the City.  *Monell*, 436 U.S. at 693-94.

## III.   CONCLUSION

For the reasons stated, Peschel has failed to raise a genuine issue of material fact suggesting that the officers' alleged violations of his constitutional rights were committed pursuant to official customs, policies, or practices of the City of Missoula, or its Police Department.  Therefore, the City of Missoula's Motion for Summary Judgment is **GRANTED** and Peschel's claims advanced against the City of Missoula under 42 U.S.C. § 1983 are **DISMISSED**.

DATED this 15th day of October, 2009.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

ORDER - Page 40